# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

KEVIN LAVERY,

      Appellant,

v.

PURSUANT HEALTH, INC.,

      Appellee.

_____

Appeal from the Judgment of the U.S. District Court
for the Eastern District of Michigan

# APPELLANT'S BRIEF

## Oral Argument Requested

ENDURANCE LAW GROUP PLC
Bradley L. Smith (MI P48138)
156 W. Michigan Ave. No. 55
Jackson, Michigan 49201
Telephone: (517) 879-0253
bsmith@endurancelaw.com

*Attorney for Appellant Kevin Lavery*

## DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST

1.     Is Appellant Kevin Lavery a subsidiary or affiliate of a publicly owned

corporation?  NO.


2.     Is there a publicly owned corporation, not a party to the appeal, that has a

financial interest in the outcome?  NO.

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ...... i

TABLE OF AUTHORITIES ................................................................................... iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ................................... iv

STATEMENT OF JURISDICTION ................................................................ 1

STATEMENT OF THE ISSUE ....................................................................... 2

INTRODUCTION .......................................................................................... 3

STATEMENT OF THE CASE ...................................................................... 4

    Parties ...................................................................................................... 4

    Lavery's Patent and Origins of Relationship ........................................ 5

    Consideration Exchanged at Closing ..................................................... 6

    Royalty Base, Two-Tiered Royalty Percentage ..................................... 8

    Lavery's Non-Patent IP Contributions ................................................ 10

        Pre-closing Contributions ............................................................ 10

        Contributions After Closing ........................................................ 12

    Procedural History ............................................................................... 17

SUMMARY OF ARGUMENT .................................................................... 17

ARGUMENT ................................................................................................ 18

    I.   Standard of Review ..................................................................... 18

    II.  Pursuant Bears the Burden of Showing by Clear Evidence That Federal Law Preempts Delaware State Law. .................................................... 19

    III. The 1% Perpetual Royalty Is Lawful Because it Discounts the Royalty Rate Prescribed for Kiosks Incorporating a Patented Retinal Camera. ................. 20

    IV. The 1% Perpetual Royalty is Lawful Because it is Based Lavery's Non-Patent Contributions. .................................................................................... 24

    V.  The 1% Perpetual Royalty Is Lawful Because it is Deferred Compensation. ........ 30

CONCLUSION ............................................................................................. 31

CERTIFICATE OF COMPLIANCE CONCERNING BRIEF LENGTH ....................... 32

CERTIFICATE OF SERVICE ..................................................................... 32

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ....................... 33

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)..............................................18

*Ares Trading SA v. Dyax Corp.*, Case No. 19-02300

   (D. Del. Feb. 21, 2023)............................................................... 22, 29

*Aronson v. Quick Point Pencil Co.*, 440 U.S. 257 (1979) ......................................19

*Boggild v. Kenner Products, Div. of CPG Products Corp.*,

   776 F.2d 1315 (6th Cir. 1986) ..................................................... 22, 23

*Brulotte v. Thys Co.*, 379 U.S. 29 (1964)........................................................ passim

*Cricut, Inc. v. Enough for Everyone, Inc.*, 2:21-CV-00601-TS

   (D. Utah Jun 05, 2024) .................................................................23

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000)............................................20

*Kimble v. Marvel Ent., Inc.,* 727 F.3d 856 (9th Cir. 2013)....................................29

*Kimble v. Marvel Enterprises, Inc.,* 727 F.3d 856 (9th Cir. 2013).........................22

*Kimble v. Marvel Entertainment, LLC,* 576 U.S. 446 (2015)......................... passim

*Willard v. Huntington Ford, Inc.,* 952 F. 3d 795 (6th Cir. 2020)............................18

*Wyeth v. Levine,* 555 U.S. 555, 571 (2009) ...........................................................20

*Zimmer Biomet Holdings, Inc. v. Insall*, case no. 22-CV-02575,

   2023 WL 2895749 (N.D. Ill., April 11, 2023) ....................................27

## Statutes

28 U.S.C. §1291 .......................................................................................................1

28 U.S.C. §1331 .......................................................................................................1

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This appeal concerns the enforceability of Pursuant's promise to pay perpetual sales royalties to Dr. Lavery. Though the underlying facts are not seriously contested, the parties vigorously disagree on the characterization of those facts, and whether federal law displaces state law to prohibit a perpetual royalty under the circumstances. Oral argument will assist the panel in contrasting the facts in this case to those which confronted the Supreme Court in *Brulotte v. Thys Co.* and *Kimble v. Marvel Entertainment.*

# STATEMENT OF JURISDICTION

The District Court had jurisdiction over plaintiff's contract claims pursuant to 28 U.S.C. §1332 (diversity).

The District Court entered judgment dismissing Lavery's claims on March 25, 2024 (ECF 52) together with an opinion and order (ECF 51). Lavery timely filed his notice of appeal on April 17, 2024 (ECF 53). This Court has jurisdiction of Lavery's appeal pursuant to 28 U.S.C. §1291.

**STATEMENT OF THE ISSUE**

Whether the District Court erred in granting summary judgment by ruling that Pursuant's agreement to pay Lavery a perpetual royalty was an unlawful extension of patent term rather than an enforceable promise to defer compensation defer compensation for Lavery's non-patent IP contributions?

*Appellant Lavery answers YES.*

*Appellee Pursuant answers NO.*

# INTRODUCTION

In 2003, Dr. Lavery received a patent for his novel apparatus and method for screening users' medical conditions in compact and convenient kiosks, particularly vision screening and more particularly screening using a retinal camera. Four years later, Lavery and Pursuant Health's predecessor entered into a Contribution Agreement. At issue here is whether the promised 1% perpetual royalty on Pursuant's sales of vision screening kiosks is enforceable.

In *Kimble v. Marvel Entertainment, LLC,* 576 U.S. 446 (2015), the Court affirmed its holding in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964) that an agreement to pay a perpetual royalty in exchange for using a patent beyond its expiration contravened the policy and purpose of the patent laws and was thus not enforceable. The Court limited the reach of its holding, however, instructing that post-expiration royalties are lawful if tied to a non-patent right, or if the post-expiration payments reflect deferred compensation for pre-expiration use of a patent. Relying on *Kimble,* the District Court entered summary judgment dismissing Lavery's claims that Pursuant had defaulted on its contract.

The facts here support enforcement of the parties' bargain under *Kimble*'s teaching. Unlike *Kimble* and *Brulotte*, the Contribution Agreement has a two-tier royalty rate: Pursuant agreed to pay a 3% royalty on sales of kiosks equipped with the featured element of Lavery's patent – a retinal camera – during the term of the patent, with the royalty *reverting to 1% after the patent expired*. The 1% portion

3

was not tied to sales of items that might infringe the patent, but rather to Pursuant's sales of *any* vision screening kiosks *irrespective* of whether the kiosks incorporated a patented feature. Effectively, 3% was the patent-protected rate and 1% was the discounted rate for the non-patent rights. The perpetual royalty is enforceable because it is not tied to patent use but rather compensates Lavery for a bundle of rights over and above the Patent, including his years of service as Pursuant's Chief Medical Officer, his assignment of trade secrets and new inventions to the company, and extensive consulting services which were treated by the parties as trade secrets. The perpetual royalty represented deferred compensation for Lavery's valuable – and otherwise uncompensated – start-up services. These facts place this case outside *Kimble*'s proscription on perpetual royalties tied only to the use of a patent.

## STATEMENT OF THE CASE

**Parties**

Dr. Kevin T. Lavery, M.D. is a renowned ophthalmologist, physician, and leader in his field. He is board-certified by the American Board of Ophthalmology, a member of the American Academy of Ophthalmology, has authored numerous clinical studies and scholarly papers, and has performed tens of thousands of surgeries that have helped people afflicted with vision disorders. Complaint ¶¶1-4 (ECF01 PageID.2).

Pursuant Health, Inc. began business in 2007 as SoloHealth, originally providing self-service vision screening kiosks. Complaint ¶ 80(a) (ECF 01 PageID.17). Pursuant has installed its health kiosks in over 4,600 retail locations around the country, including thousands of Walmart stores. Millions of people use its free kiosks to check their health status. *Id.* ¶¶ 80(c), (e). Pursuant's business has expanded to include multiple "engagement mechanisms, data collection channels, and incentive management capabilities." It uses information collected at its kiosks to perform under contracts it has made with health plans, including national Medicaid and Medicare plans. *Id.* ¶ 80(d). Other revenue streams may include leasing or usage fees and advertising sales. *Id.* ¶56.

**Lavery's Patent and Origins of Relationship**

In February 2000, Lavery filed a provisional patent application for a "Retinal Screening Apparatus." Patent, Complaint Ex.2 (ECF 1-4, PageID.43). In 2003 he was granted U.S. Patent No. 6,594,607 "Medical Screening Apparatus and Method." *Id.* PageID.40. The gist of his invention was a user-operated kiosk equipped with automated medical testing equipment for performing vision tests and retinal scans, and transmittal of the results to a remote site for analysis via the internet. *See id.* at PageID.43 ("Referring now to the drawing, and to FIGS. 1-4 in particular, there is depicted a retinal screening apparatus and system according to the present invention."). The concept was revolutionary when Lavery filed his patent.

In 2007, Lavery met Bart Foster, the founder and principal of SoloHealth. Within months they decided to combine their skills and resources to launch a new company. *See* Oct. 11 2007 Contribution Agreement (ECF 030-8 PageID.508); *see also* June 5 2007 Letter of Intent (ECF 030-7 PageID.501). Lavery alleges that the purpose of the Contribution Agreement was for Dr. Lavery to contribute certain intellectual property "so SoloHealth could develop and distribute products under the Patent *in the form of a retinal scan kiosk*." Complaint ¶68 (ECF 1 PageID.14). Bart Foster did not dispute this allegation. Foster dep. 94 (ECF 30-2 PageID.401 (cannot say whether or not the company intended to distribute kiosks with retinal scan at time of Contribution Agreement).

As described in more detail below, Lavery provided far more than his patent to the new company. He contributed services, reputation, related know-how, and other IP. In return, he received 10% equity in SoloHealth and the potential for royalty payments *if* the nascent company could get funding, design and build a marketable product, obtain government approvals, secure locations, and realize sales. Foster and Lavery were both taking on large risks. They structured their deal to share those risks and potential rewards.

**Consideration Exchanged at Closing**

1. At the closing of the parties' deal, Lavery assigned to SoloHealth his patent and related "Intellectual Property" (discussed below). In return he received 10% equity in the company, $2,500 cash, and a conditional right to receive

6

another $7,500. Contribution Agreement §1.1 (closing) (ECF 30-8 PageID.508); §1.5 ($2,500 cash plus $7,500 IOU). SoloHealth also agreed to pay him royalties if/when the company realized sales.

2.  At the closing, Lavery signed a Contribution Agreement (ECF 30-8 PageID.508) and a Patent Assignment (ECF 30-10 PageID.531).[1] In addition to the patent, Lavery conveyed "All proprietary information, trade secrets, and other intellectual property rights held by Lavery and attendant to the Patent." Contribution Agreement Exhibit B ("Intellectual Property") (ECF 030-08 PageID.520).

3.  As of the closing date, the parties placed a value on Lavery's patent and the Intellectual Property of $10 (ten dollars). *Id.* ¶1.4.

4.  Upon signing the Contribution Agreement and the patent assignment, Lavery thus conveyed to SoloHealth not only the patent but all the trade secrets he had disclosed to Foster during their earlier discussions.

5.  The Contribution Agreement attached and incorporated a separate Consulting Agreement signed the same day (ECF 30-8 PageID.536) and installed Lavery as the company's Chief Medical Officer. *Id.* § 1.6.

---

[1] Lavery also signed an amended operating agreement relating to his membership in SoloHealth LLC, which is not relevant to this appeal.

6.     At the closing, Lavery also assigned to SoloHealth all his future inventions, copyrightable works, trade secrets, know-how, etc. he might conceive or provide through his services as SoloHealth's Chief Medical Officer:

> Consultant shall assign to the Company, and *hereby does assign*, all Works disclosed, or *required to be disclosed*, in accordance with this Agreement and assigns the right to obtain patents or copyright registrations on any and all such Works in any or all countries in his name or otherwise . . . without further compensation.

Consulting Agreement ¶8 (emphasis added) (ECF 30-12 PageID.538); *see also id.* ¶7 (broadly defining Works); ¶9 (broadly assigning other IP rights). Thus at the closing, Lavery assigned to SoloHealth his past, present, and future IP contributions relating to vision kiosks, in addition to his patent.

**Royalty Base, Two-Tiered Royalty Percentage**

7.     As recorded in their June 2007 Letter of Intent, the parties initially contemplated that Lavery would receive a flat 3% royalty on U.S. sales of all products that included a retinal camera or retinal imaging system, which would remain in effect for an undefined term.  LOI ¶8 (ECF 30-7 PageID.507).

8.     After months of discussions regarding fairly sharing risks and profits, the parties ultimately settled on a royalty arrangement that differed from the structure contemplated in the LOI in five respects:

a. They structured the royalty in two tiers, 1% or 3% depending on whether the products incorporated a retinal camera as claimed in Lavery's patent;

b. They limited the term of the 3% royalty tier to the life of the patent;

c. They discounted the first-tier royalty percentage from 3% to 1% but made that first tier royalty perpetual;

d. They expanded the sales royalty base to require a royalty on sale of <u>any</u> vision kiosk, as well as any derivative or complementary application, irrespective of whether the kiosk was covered by Lavery's patent; and

e. They expanded the base beyond the U.S. to include sales throughout North America.[2]

9.  Put differently, the Contribution Agreement set a two-tier royalty depending on whether the company began selling kiosks that incorporated a central feature of Lavery's patent, a retinal camera:

- a 1% royalty on all vision screening kiosk sales in North America irrespective of whether the kiosks would infringe Lavery's patent that was <u>perpetual</u>

- a 3% royalty on North American kiosk sales if/when the company launched kiosks that incorporated a retinal camera. This higher rate would <u>terminate with expiration of the patent</u> and then revert to 1%.

*See* Contribution Agreement § 1.2(a) (ECF 030-8 PageID.509); ¶1.2(g) (defining "Term" to mean expiration of the Patent).

10. Both parties understood and accepted the tiered royalty arrangement with the higher rate ending with expiration of the patent. Lavery testified that he

---

[2] They also added provisions to adjust the royalty if the company had to pay royalties to other intellectual property holders. Contribution Agreement §1.3(a), (b) (ECF 30-8 PageID.510). To the best of Lavery's knowledge, these provisions were not triggered and are not relevant to this case.

closely questioned SoloHealth's representatives at the closing concerning

the meaning of the words "for the remainder of the Term" appearing in

paragraph 1.2(a):

> So at closure when I looked at that statement, I asked Brian
> Gordon [SoloHealth's attorney] – I said Brian, this is – this is
> the crux of what we're discussing here today. Everything else
> about whether or not I get the three percent and this and that,
> but the crux of it is this one percent. Can you walk me through
> this one percent?
>
> And Brian took me through line by line. And what he said –
> because I saw that when I read that there. And I didn't
> remember it, but you know, I've got six, seven, eight people
> around the table at closing. And he said, oh**, that term only
> applies to the patent portion of the three percent, the retinal
> camera.** That does not affect the one percent royalty perpetual.
> And those were his words that I definitely remember. Because
> I was not going to sign that document until he was clear to me
> that that one percent was perpetual. And he fully assured me
> that that was perpetual.

Lavery dep. 68-69 (ECF 36-1 PageID.908-09) (emphasis added).

## Lavery's Non-Patent IP Contributions

In addition to his patent, Lavery provided medical expertise, business

contacts, know-how, and over a decade of service as the company's chief medical

officer.

<u>Pre-closing Contributions</u>

11.     Lavery proved his concept could work by introducing Foster to a software

and biomedical engineer who demonstrated a working model of retinal

screening using infrared sensors. Lavery dep. 44-45 (ECF 48-2

PageID.1171-72). Lavery also communicated business ideas how to best commercialize the medical kiosk concept including i) broadening the capabilities of the kiosk beyond simple vision screening (such as hearing testing); ii) introducing a new-to-market eye care delivery system, disruptive entry in the eye care and ophthalmology; iii) exploiting alternative revenue streams beyond consumer payment, such as collecting referral fees from large retailers and ophthalmologists; and iv) collecting fees from insurance companies for screening services. *Id.,* Lavery dep. 26-27 (hearing testing), 33-36 (business model with alternate revenue streams); 59-61 (ideas communicated at pre-closing discussions); Lavery viewed these strategic business ideas as "the things that were going to bring, in my mind, the patent to life." *Id.* at 36.

12. Bart Foster agreed that Dr. Lavery's pre-closing discussions with him were confidential and could not be disclosed. Foster dep. 139 (ECF 48-3 PageID.1204). Foster included the confidentiality clause in the Letter of Intent because Lavery was sharing ideas and confidential information beyond what he disclosed in his patent, and if Lavery disclosed those ideas to someone else it could be detrimental to the planned business. Foster dep. 140-41 (*id*. PageID.1205-06); *see also* LOI (ECF 030-7 PageID.504) (all discussions after signing the LOI subject to confidentiality and nondisclosure).

13. As noted in point 4 above, these business and IP contributions were conveyed to SoloHealth at the closing along with the patent.

Contributions After Closing

14. Lavery generated the bulk of his non-patent intellectual property in the years after the closing pursuant to his duties as Chief Medical Officer and consultant under the Consulting Agreement. (ECF 030-08 PageID.536). As noted in point 6 above, Lavery had previously assigned these IP contributions to SoloHealth at the closing.

15. Lavery's duties as Chief Medical Officer included:

- Helping to ensure the scientific accuracy of SoloHealth's products, services and communication;
- Evaluating consumer and professional content for scientific accuracy;
- Overseeing clinical trials;
- Providing technical guidance related to the visual acuity measurements;
- Overseeing SoloHealth's scientific advisory boards;
- Serving as a liaison between SoloHealth and the optical community and other government and regulatory bodies; and
- Participating in speaking engagements with the media and with various trade groups.

Chief Medical Officer Roles and Responsibilities, Letter of Intent Appendix A (ECF 30-7 PageID.506).

16. Lavery provided frequent and extensive consulting to the company over many years. Making new contributions for the company was an express requirement under the Consulting Agreement:

> Consultant acknowledges and agrees that as part of Consultant's engagement with the Company, *Consultant is expected to make new contributions of value to the Company*. Consulting Agreement ¶ 7 (ECF 30-12 PageID.537).

17. The scope of the contributions that Lavery assigned to SoloHealth was unusually broad. The deal required Lavery to convey all his ideas, inventions, and know-how:

> which relate to, or are capable of use in connection with the Products (as defined in the Contribution Agreement), or any services or programs offered, used, sold or being developed by the Company in connection with the Products. Any and all of the foregoing shall belong exclusively to the Company.

*Id.* PageID.538. The Consulting Agreement imposed on Lavery a continuing obligation to convey his ideas and inventions regardless of when or how he conceived them and *regardless whether he conceived them in the course of performing his duties at SoloHealth*. In other words, Lavery was tasked with conceiving and irrevocably conveying to SoloHealth any idea which related to its business or was even capable of use in connection with the Products.

18. Lavery's contributions under the Consulting Agreement were treated as closely guarded confidential trade secrets. *Id.* PageID.536-37 (broad confidentiality clause prohibiting use or disclosure of Confidential Information "during the Engagement Period and thereafter"). Bart Foster confirmed that the contributions that Lavery made under the Consulting

Agreement were SoloHealth property. Foster dep. 101 (ECF 48-3 PageID.100-01).

19. Lavery provided his services as SoloHealth's Chief Medical Officer and expert consultant with no compensation other than the 1% royalty. Lavery dep. 75-76 (Pursuant never paid Lavery's services as Chief Medical Officer or consultant) (ECF 48-2 PageID.1148-49); *see also* Consulting Agreement § 3 (no compensation for first 20 hours/month) (ECF 030-12 PageID.536).

20. It is undisputed that Dr. Lavery provided extensive technical advice, business guidance, and strategic advice as consultant and Chief Medical Officer. *See* Lavery dep. 71 ("absolutely" provided intellectual property to SoloHealth after the closing) (ECF 48-2 PageID.1185), *id*. at 73 (worked extensively on SoloHealth business model after the closing), *id*. at 75-76 (extensive calls, meetings and discussions with SoloHealth under the Consulting Agreement).

21. For example, Lavery provided very substantial assistance securing a critical $1.2 million grant from the National Institute of Health. Lavery dep 19-20 (ECF 48-2 PageID.1172). Indeed, Pursuant still touts this achievement as a company milestone on its website. Complaint ¶80(b) (ECF 01 PageID.17).

22. Lavery lent his reputation as a top ophthalmologist during rounds of capital fundraising, assisted with validating processes, and served as an immediate source of expertise and guidance on "what data we should get and how we

should use it." Lavery dep 19-20 (ECF 48-2 PageID.1171-72). Lavery

shared his priceless contacts in the industry, including lens manufacturers

(*Id.* 61) and provided instant credibility for the new company through his

reputation as a recognized expert in ophthalmology. He summarized:

> [Bart Foster] saw that I had contacts in the industry, that I had
> been talking to lens manufacturers, that I knew optometry well. I
> had been speaking at big optometric national meetings. I had a
> big optometric referral network. I knew ophthalmology. They
> didn't know ophthalmology. They didn't have any doctor on their
> staff. They weren't thinking about the medical aspects of what we
> could do. And so between all of the different things that – you
> know, the businesses I've run, the contacts, the knowledge in
> medicine, he wanted me at the table. He wanted access to those
> ideas. And that's why we talked as much as we did even after the
> closing and starting the business. He ran most ideas by me before
> implementing them.

Lavery dep. 61-62 (*id.* PageID.1183-84*)*.

23. Dr. Lavery regularly communicated with SoloHealth personnel for many

years, including with Pursuant's current president Leslie Sommers, until

about January 2022, shortly before he filed this lawsuit. Lavery dep. 18

(ECF 48-2 PageID.1170) (describing "fairly regular" communications

including video conferences with Pursuant regarding implementation of

retinal camera into kiosk).

24. None of the above facts are seriously disputed. Bart Foster corroborated all

of Lavery's alleged contributions under the Consulting Agreement and

more. Foster readily agrees that Dr. Lavery provided many ideas on how he

saw the kiosk rolling out.  Foster dep. 149 (ECF 48-3 PageId.1210) ("He had tons of ideas.").  Foster confirmed that he spoke "frequently" with Dr. Lavery after the closing about "all kinds of things … and ideas."  *Id*. 105. For example, Lavery provided a specific business model involving physician referrals (*id*. 98-99), provided names of potential vendors, consultants, regulatory path guidance, clinical validation, content of eye health information provided by a kiosk (*id.* 100); and recommended putting a retinal camera into the kiosk device (*id.* 103).  Lavery's contributions after the closing included market size, ophthalmology markets and scope *(id.* at 109-10), as well as ideas relating to internet connectivity of kiosk (*id.* 145).

25. It is undisputed that Lavery fulfilled his duties and provided SoloHealth with recommendations and consulting expertise on equipment design, hardware modifications, ophthalmology expertise, business ideas, and strategic guidance.  Bart Foster further testified:

Q. Do you have a memory of making any modifications to the kiosk in late 2008 or early 2009 as a consequence of any information received … from Dr. Lavery?

A. **Absolutely**…. I bet we made 100 little modifications. And it could have been everything from change the button from green to orange. It could have been make sure the sign is – says free. Modify the hardware this way.  **Dr. Lavery and I would talk sometimes every couple weeks**; sometimes a couple months would go by.  I didn't take detailed notes of who said what.  We were just moving.  We were moving fast. So I can't clearly determine who said what and what modifications were made.

Foster dep. 123-25. Foster summed up Dr. Lavery's many post-closing contributions to the company as "He had tons of ideas." *Id.* 149.

**Procedural History**

Pursuant moved for summary judgment under Rule 56 asserting that *Brulotte*, *Kimble,* and other cases barred enforcement of the 1% perpetual royalty. ECF 30. Pursuant subsequently moved for Rule 11 sanctions, arguing that Lavery's claims were frivolous. ECF 34. Lavery responded to both motions. While these motions were pending, the case was reassigned to Judge Jonathan Grey who granted leave for an additional round of briefing and heard oral argument. 10/31/2023 Transcript (ECF 55). The District Court granted summary judgment for Pursuant on March 25, 2024 but denied its motion for sanctions. ECF 51. This appeal followed.

## SUMMARY OF ARGUMENT

*Kimble* allows enforcement of a royalty agreement if it differentiates between 1) a higher royalty rate for patent-protected sales and 2) a lower rate, that survives patent expiration, applicable to sales of any goods regardless of patent protection. *Kimble* also allows a perpetual royalty if it represents deferred compensation.

Both allowances apply in this case. The 1% perpetual royalty is enforceable because the contribution agreement sets two tiers of royalties: a higher royalty rate directly tied to kiosk sales that read on Lavery's patent and which terminated with

17

expiration of the patent, and a discounted perpetual royalty rate that is based on sales of <u>any</u> vision screening kiosk, regardless whether the kiosk reads on the patent claims. A reasonable jury will conclude that the 1% perpetual royalty represents compensation for Lavery's non-patent trade secrets, assistance, and consulting services, and not compensation for use of the patent.

## ARGUMENT

### I.     Standard of Review

The Court is familiar with the *de novo* standard for reviewing the District Court's grant of summary judgment. The burden is on the moving party to show that there are no genuine issues of material fact and that it is legally entitled to judgment. Then, the nonmoving party must present sufficient evidence to permit a reasonable jury to find in its favor. *Willard v. Huntington Ford, Inc.,* 952 F. 3d 795, 805 (6th Cir. 2020). "Our ultimate question is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving plaintiff is entitled to a verdict." *Id.* (cleaned up)*, citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). The Court must view all of the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in the nonmoving party's favor. *Anderson,* 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ." *Id.*

## II. Pursuant Bears the Burden of Showing by Clear Evidence That Federal Law Preempts Delaware State Law.

Delaware law, which governs the parties' Contribution Agreement, would enforce the perpetual royalty. Contribution Agreement §5.3 (choice of law) (ECF 30-8 PageID.513). As the party challenging the lawfulness of the perpetual royalty, Pursuant must show that federal law preempts state contract law.

> Commercial agreements traditionally are the domain of state law. State law is not displaced merely because the contract relates to intellectual property which may or may not be patentable; the states are free to regulate the use of such intellectual property in any manner not inconsistent with federal law.

*Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979).

In *Aronson*, Quick Point had agreed to pay Mrs. Aronson a 5% royalty if a patent issued on her unique keyholder device, or a 2½% royalty if a patent was not granted. When her patent application was rejected, Quick Point invoked *Brulotte* to avoid paying the 2½% royalty. The Court held that federal law did not preempt state law because the lower royalty rate did not involve use of a patented item, so federal common law directed at preventing patent misuse did not apply. 440 U.S. at 264-66.

Whether federal law preempts Delaware law in this case collapses into an analysis whether the parties' tiered royalty agreement constitutes patent misuse under *Brulotte* and *Kimble*. Nevertheless, it is instructive to frame the issue as whether federal law preempts the parties' choice of law, at least for the reason that

courts require a clear showing before finding federal preemption of state law.  *See Wyeth v. Levine,* 555 U.S. 555, 571 (2009) (party asserting preemption has burden to establish the predicate facts by "clear evidence"); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000) ("court should not find pre-emption too readily in the absence of clear evidence of a conflict").

The evidence is far from "clear" that the 1% perpetual royalty was tied to patent use; indeed, the opposite is true.  As argued at greater length below, there is no patent misuse because the parties discounted the higher 3% royalty rate to 1% after the patent terminated.  The perpetual 1% royalty compensated Lavery for his extensive non-patent contributions particularly during the start up years:  trade secrets, reputation, fundraising, medical advice, regulatory guidance, and other consulting services.

Whether analyzed under the rubric of federal preemption or under *Kimble*'s framework for permissible post-expiration royalties, Lavery has raised a genuine issue of fact concerning whether the 1% royalty was tied to utilization of the patent or deferred compensation for his other IP contributions.

## III.   The 1% Perpetual Royalty Is Lawful Because it Discounts the Royalty Rate Prescribed for Kiosks Incorporating a Patented Retinal Camera.

Lavery contributed his patent as well as non-patent IP and related services.  The Contribution Agreement reflected this reality by assigning a 3% royalty rate during the patent term for kiosks incorporating a retinal camera, and a 1% royalty

rate for vision kiosks that did not.  The Supreme Court endorsed this arrangement

as lawful in *Kimble*.  In fact, the Ninth Circuit opinion which *Kimble* affirmed held

that the presence of a discounted royalty rate is dispositive on whether a post-

expiration royalty is lawful.

In *Kimble v. Marvel Entertainment, LLC,* 576 U.S. 446 (2015), the Supreme

Court confirmed its holding in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964) that an

agreement to pay a perpetual royalty in exchange for using a patent beyond its

expiration was not enforceable as a matter of federal patent policy under which

inventions belong to the public after patent expiration.  Relying primarily on *stare*

*decisis*, the Court held that a licensee may not receive royalties for using an

invention after it has moved into the public domain.  *Kimble,* 576 U.S. 453-54.

However, the Court was sensitive to economic criticisms of its *Brulotte* decision,

and offered that parties might "find ways around *Brulotte*, enabling them to

achieve those same ends."  *Id.* at 453:

> A licensee could agree, for example, to pay the licensor a sum
> equal to 10% of sales during the 20-year patent term, but to
> amortize that amount over 40 years.  [Further,] **post-expiration**
> **royalties are allowable so long as tied to a non-patent right—**
> **even when closely related to a patent.**  *See, e.g.*, 3 Milgrim on
> Licensing §18.07, at 18-16 to 18-17.  *That means, for example,*
> *that a license involving both a patent and a trade secret can set a*
> *5% royalty during the patent period (as compensation for the two*
> *combined) and a 4% royalty afterward (as payment for the trade*
> *secret alone).*

*Kimble*, 576 U.S. at 454 (emphasis added).

As with a party asserting federal preemption of state contract law, the party challenging a post-expiration royalty bears the burden of showing it is based on use of licensed patents. *Ares Trading SA v. Dyax Corp.*, Case No. 19-02300, Conclusion of Law ¶¶1, 6 (D. Del. Feb. 21, 2023) (challenger has burden of proof and "must provide clear evidence to establish that *Brulotte* applies").

The Ninth Circuit's opinion, which the Supreme Court affirmed in its entirety, is dispositive for the instant case. That court held that where a royalty implicates both patent and non-patent components, the determining fact is whether the royalty rate changes after patent expiration:

> The rule that follows, in relevant part, is that a license for inseparable patent and non-patent rights involving royalty payments that extends beyond a patent term is unenforceable for the post-expiration period **unless the agreement provides a discount for the non-patent rights from the patent-protected rate**.

*Kimble v. Marvel Enterprises, Inc.,* 727 F.3d 856, 863 (9th Cir. 2013) (emphasis added). The Supreme Court endorsed the Ninth Circuit's approach, instructing that post-expiration royalties involving sales of goods having closely related "hybrid" patent and trade secret rights are enforceable if the rate is discounted after the patent expires. 576 U.S. at 454 (endorsing 5% then 4% post-expiration rate).

In formulating its rule, the Ninth Circuit relied in part on this Court's legal analysis in *Boggild v. Kenner Products, Div. of CPG Products Corp.*, 776 F.2d 1315 (6th Cir. 1986). In *Boggild*, this Court found that a post-expiration royalty provision that continued at the same rate after patent expiration was barred by

22

*Brulotte,* even though the royalty was for a hybrid of a licensed patent and trade secrets. Importantly, the *Boggild* court indicated that it would not have disturbed the agreement if the parties had reduced the royalty rate after patent expiration:

> [T]he agreement calls for royalties on the sales of the patented extruder for a minimum of twenty-five years. As in *Brulotte*, the agreement contains neither provisions for reduction of royalties in the event valid patents never issued nor terms for reduction of post-expiration royalties. The provisions for use of the extruder and payment of royalties are applicable to both the pre-expiration and post-expiration periods. Therefore, under *Brulotte*, the agreement is unlawful *per se.*

*Boggild,* 776 F.2d at 1321; *see also Kimble v. Marvel Enterprises,* 727 F.3d at 863 (citing *Boggild* with approval); *Cricut, Inc. v. Enough for Everyone, Inc.*, 2:21-CV-00601-TS (D. Utah Jun 05, 2024) ("Hybrid agreements … are permissible so long as there is some way to distinguish between the patented and non-patented rights.")

In this case, there is no dispute that the 3% royalty rate applied only to kiosks having a retinal camera, which would clearly be covered under Lavery's patent. Nor is there any dispute that the royalty rate would revert to 1% after that patent expired. The fact that the parties slashed the royalty rate after patent expiration is conclusive evidence that the 1% royalty is not tied to the patent and is therefore enforceable.

## IV. The 1% Perpetual Royalty is Lawful Because it is Based Lavery's Non-Patent Contributions.

Unlike the sales base on which the 3% royalty was calculated, the 1% royalty was calculated merely on "vision screening kiosks and any derivative or complementary applications." Contribution Agreement §1.2(e) ("products") (ECF 30-8 PageID.509). Nothing in the sales base suggests that it was limited to kiosks which would otherwise infringe the Patent. Any number of kiosk configurations might not infringe.

For example, if SoloHealth sold kiosks that required users to initiate and operate the vision screening equipment themselves, it would not infringe Lavery's patent because each of his claims included an element that the testing be "*fully automated*" in response to patient activation. *See* Lavery Patent Claims 1, 13, Complaint Ex.2 (ECF 1-4, PageID.44). This is especially significant because Bart Foster's invention, for which he later received a patent, did <u>not</u> necessarily comprise fully automated testing. In fact, claim 1 of Foster's patent appears to exclude fully automated testing because it explicitly requires that the vision screening equipment be "*subject-operated*." U.S. Patent 7,614,747 claim 1 (ECF 30-3 PageID.427). A strong argument can be made that if Pursuant had sold a kiosk that presented all the elements of claim 1 of Foster's patent, by definition it would not infringe any claim of Lavery's patent.

Similarly, a vision screening kiosk would not infringe Lavery's patent if it did not incorporate "patient activation" to initiate a test. Nor would a vision screening kiosk infringe if it simply displayed or printed out test results, rather than transmitting them to a remote site. *See* Lavery Patent Claims 1, 13 *supra.* Nevertheless, all such kiosks were covered by the 1% royalty.

Another fact strongly supporting Lavery's contention that the 1% royalty was tied to his non-patent contributions is that the royalty base extended beyond the United States to include kiosk sales throughout North America. Contribution Agreement 1.2(d) (defining Net Domestic Sales) (ECF 30-8 PageID.509). But Lavery never obtained patents in those jurisdictions, and kiosk sales to Canada, Mexico or the Caribbean were not protected by Lavery's U.S. patent. The only reason to pay a 1% royalty on sales to those countries was to compensate Lavery for his non-patent contributions.

The deposition testimony strongly corroborates that the 1% royalty portion was not tied to patent use. Both Lavery and Foster believed that the central and most significant feature of Lavery's patent was a kiosk incorporating a retinal camera. *See* Lavery dep. 68-69 (ECF 36-1 PageID.909) (both parties understood that the "remainder of the Term" language applied only "to the patent portion of the three percent, the retinal camera").

Foster had the same understanding. He testified that he had no interest in acquiring Lavery's patent *in order to practice it*; he wanted to use it as leverage to

acquire a pending patent application from his then-employer, CIBA Vision and its partner Novartis, for the "EyeSite" vision examination kiosk which he wanted to commercialize:

Q.  Did you have the objective of including a retinal camera in the kiosk that you had developed?

A.  No.

Q.  What was your objective in entering into the letter of intent with Dr. Lavery…?

A.  To have leverage with CIBA Vision and Novartis.

Q.  And what do you mean by that? What kind of leverage were you looking for with CIBA Vision and Novartis?

A.  To be able to acquire the intellectual property that they had on the EyeSite kiosk.

Q.  In other words, leverage to acquire from CIBA Vision the patent for which you were the named inventor?

A.  Correct.

Q.  And that was your objective in entering into the letter of intent with Dr. Lavery?

A.  Yes.

Q.  **Was there any other objective that you had in mind when you entered into the letter of intent with Dr. Lavery?**

A.  **I don't think so.**

Q.  And how did acquiring -- how did the letter of intent that you executed with Dr. Lavery, how did that provide leverage to you in your negotiations with CIBA Vision and Novartis?

A.  Dr. Lavery had an issued patent, which was much stronger than -- in my view was much stronger than a patent pending.

Foster dep. 78-79 (emphasis added) (ECF 30-2 PageID.396-97).

The testimony concerning the parties' frame of mind corresponds perfectly with the royalty arrangement they agreed to. They included a 3% tier to compensate Lavery for using his patent if SoloHealth ever incorporated a retinal camera. The 1% perpetual component was for everything else Lavery contributed: his service as the company's Chief Medical Officer, his reputation and influence in the industry, his invaluable contacts, his medical experience, his business acumen, his ready availability, etc. Lavery received no cash compensation for the hundreds of hours he dedicated to the company in those early years, providing SoloHealth with valuable advice, know-how, introductions, and countless other trade secrets. He performed because of a promise that he would receive a perpetual 1% royalty if the company could some day finance, design, build, and sell a saleable product.

At least two cases decided since *Kimble* have enforced a royalty extending beyond a patent term, based on a finding that the royalty base included items or methods that might not infringe an expired patent. Especially instructive is *Zimmer Biomet Holdings, Inc. v. Insall*, case no. 22-CV-02575, 2023 WL 2895749 (N.D. Ill., April 11, 2023) (ECF 48-1 PageID.1155). Briefly summarized, in 1991 Zimmer promised Dr. Insall, the inventor of an improved artificial knee, a 1% royalty on sales of Zimmer's products "until expiration of the last to expire of the patents licensed hereunder or so long as Product is sold by Zimmer, whichever is last to occur." Memorandum Order, p.3, *id.*. In 1994 and 1998, the parties

amended their agreement to tie the perpetual 1% royalty to "all sales of the NexGen Knee and all subsequently developed articles, devices or components marketed by Zimmer as part of the NexGen Knee family." After Insall's patents expired in March 2018, Zimmer argued that *Brulotte* allowed it to suspend royalty payments, even though it continued to sell products incorporating the same features under the "NexGen Knee" family. An arbitration panel rejected Zimmer's argument and ruled that *Brulotte* and *Kimble* did not bar perpetual payments.

Zimmer filed suit to vacate the award, arguing that the royalty was unenforceable under *Kimble* because Insall's now-expired patent leverage was "baked in" to the amended License Agreement. *Id*. at p.9. The district court, in rejecting Zimmer's arguments, affirmed the enforceability of post-expiration royalties when those royalties are tied to a non-patent right:

> The 1998 Amendment decoupled the royalty from Insall's patents by instead basing the royalty on sales of "NexGen Knee and all subsequently developed articles, devices or components *marketed by Zimmer* as part of the NexGen Knee family of knee components." In other words, the 1998 Amendment does not prevent Zimmer from using Dr. Insall's patents or tie royalties to those patents, but rather requires and ties payment to Zimmer's decision to market certain components as part of the NexGen Knee family. Since "post-expiration royalties are allowable so long as tied to a non-patent right—even when closely related to a patent," *Kimble*, 576 U.S. at 454, the Court finds no error in the Panel's conclusion that Brulotte does not apply to NexGen Knee royalties set out in the 1998 Amendment.

*Zimmer*, p.12 (emphasis original).

This is a most important fact shared by the parties here and in *Zimmer Biomet*. The 1% perpetual royalty is *calculated on a sales base that is defined without reference to a patent.* In *Zimmer*, the court emphasized that the base for the perpetual royalty was not "Zimmer products incorporating a patent claim" but rather "products marketed under the NexGen Knee family." *Zimmer Memorandum Op.* p.4. Because the royalty base did not map to the patent, the royalties were not "tied to" the patent, and permitting enforcement of the provision under state law. *Cf. Kimble v. Marvel Ent., Inc.,* 727 F.3d 856, 859 (9th Cir. 2013) (challenged royalty base defined as "product sales that would infringe the Patent").

Like the royalty base upheld in *Zimmer Biomet,* the royalty base is broader than goods that read on the patent claims. The parties did not define the royalty base as "vision kiosks that would infringe the patent" but rather "vision screening kiosks and any derivative or complementary applications." The parties' larger base even extends to all of North America, beyond the jurisdiction of the U.S. patent. Lacking a tie to Lavery's patent, the perpetual royalty does not fall within *Brulotte's* or *Kimble's* proscriptions against perpetual royalties and are lawful.

The second case upholding post-expiration royalties is *Ares Trading SA v. Dyax Corp.*, Case No. 19-02300, (D. Del. Feb. 21, 2023). The *Ares* court ruled that *Brulotte* did not apply for several reasons, including that the royalty base did not correspond to items/methods protected by the relevant patents. The facts in *Ares* are complex and less analogous to the instant case than *Zimmer*, but

nevertheless support the proposition that both the <u>rate</u> and the <u>sales base</u> on which the extended royalty is calculated are important factors in the analysis of whether the royalty is impermissibly tied to use of an expired patent.

## V.     The 1% Perpetual Royalty Is Lawful Because it is Deferred Compensation.

*Kimble* allows a licensee to defer payments earned during the patent term until later. *Kimble*, 576 U.S. at 454 (parties may pay 10% royalty on sales during the 20-year patent term, but to amortize that amount over 40 years). The parties here did that in two respects. First, Dr. Lavery's heaviest work as Chief Medical Officer and consultant occurred in the early years of his relationship with SoloHealth, during which time he received little or no compensation. In that regard, the perpetual royalty on sales after the patent term expired is deferred compensation for his substantial contributions in those early years.

Second, the Contribution Agreement explicitly provides that no royalty would accrue for one year following the launch of a vision screening kiosk. Contribution Agreement §1.2(a), (c) (defining Launch Date) (ECF 30-8 PageID.509). At least to the extent Pursuant withheld royalties during the first year of kiosk sales, a post-expiration royalty (properly adjusted for interest, etc.) is lawful deferred compensation.

## CONCLUSION

The perpetual royalty is lawful under *Brulotte* and *Kimble*, and the agreement not preempted by federal law, because the parties discounted the higher rate upon expiration of the patent, and because the sales base underlying the perpetual portion encompasses kiosks that do not infringe the patent. The evidence conclusively shows that the perpetual royalty was not tied to use of the patent but rather provided to compensate Lavery for his non-patent contributions, especially during the company's critical early years. At a minimum, the evidence raises a genuine question of fact whether the 1% royalty was primarily based on utilizing Lavery's patent, or was primarily compensation for Lavery's other contributions. This Court should reverse the summary judgment and remand the case for further proceedings consistent with its opinion.

Respectfully submitted,

Endurance Law Group PLC


/s/ Bradley L. Smith
Bradley L. Smith (MI P48138)
156 W. Main Street, No. 55
Jackson, Michigan 49201
Telephone: (517) 879-0253
E-mail: bsmith@endurancelaw.com
*Attorney for Appellant Kevin Lavery*

Dated: June 17, 2024

**CERTIFICATE OF COMPLIANCE CONCERNING BRIEF LENGTH**

I certify that Appellant's Principal Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,885 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14 pt. Times New Roman.

/s/ Bradley L. Smith
Bradley L. Smith (MI P48138)
156 W. Michigan Ave. No. 55
Jackson, Michigan 49201
Telephone: (517) 879-0253
E-mail: bsmith@endurancelaw.com
*Attorney for Appellant Kevin Lavery*

Dated: June 17, 2024

**CERTIFICATE OF SERVICE**

I certify that on June 17, 2024, I filed Appellant's Principal Brief with the Clerk of the Court, via the ECF system, which will provide electronic notification of the filing on all parties of record.

/s/ Bradley L. Smith
Bradley L. Smith (MI P48138)
156 W. Michigan Ave. No. 55
Jackson, Michigan 49201
Telephone: (517) 879-0253
E-mail: bsmith@endurancelaw.com
*Attorney for Appellant Kevin Lavery*

Dated: June 17, 2024

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Date | Dkt. No. | Description | Page ID# |
|------|----------|-------------|----------|
| 3/22/2022 | 1 | Complaint | 1-92 |
| 6/3/2022 | 7 | Answer and Aff. Defenses | 104-126 |
| 3/24/2023 | 30 | Motion for Summary Judgment | 346-673 |
| 4/14/2023 | 31 | Response to Motion for Summary Jgt | 674-734 |
| 4/28/2023 | 33 | Reply re SJ motion | 738-846 |
| 5/26/2023 | 34 | Motion for Rule 11 Sanctions | 847-862 |
| 6/9/2023 | 38 | Response to Motion for Sanctions | 1070-1077 |
| 8/14/2023 | 48 | Plaintiffs' Supplemental Brief | 1143-1210 |
| 8/28/2023 | 49 | Defendant's Supplemental Brief | 1211-1223 |
| 3/25/2024 | 51 | Opinion and Order | 1225-1240 |
| 3/25/2024 | 52 | Judgment | 1241-1242 |
| 4/17/2024 | 53 | Notice of Appeal | 1243 |
| 5/1/2024 | 55 | Transcript 10/31/2023 oral argument | 1245-1284 |